KELLY, J.
(dissenting). The majority reverses the Court of Appeals decision and reinstates defendant’s conviction after concluding that defendant failed to demonstrate that her trial counsel’s performance prejudiced her. Because there is a reasonable possibility that defendant is innocent and her counsel’s performance deprived her of her only viable defense, I believe she is entitled to a new trial. Accordingly, I dissent from the majority’s reinstatement of the guilty verdict.
THE FACTS
This case involves the death of a gravely ill man. At the time of his death, Paul Burley had been involved in a relationship with defendant, Katherine Dendel, since 1975. Burley had suffered from many illnesses including hepatitis B, hepatitis C, herpes, chronic obstructive pulmonary disease, throat cancer, an infection with human immunodeficiency virus (HIV), neuropathy, and epilepsy. Due to his poor health, Burley was frequently hospitalized and required constant care while at home, care that defendant provided.
The day of Burley’s death began with a phone call to the police. At approximately 3:00 a.m., defendant called to report that Burley was running back and forth in the house with a knife. But by the time the police arrived, all was calm. Defendant told the police that she was not *142 concerned that Burley would injure her, but was concerned that, given his impaired mental state, he might injure himself. Concluding that Burley was not a threat to himself or to anyone else at that time, the police took no action.
Later in the morning, defendant left the house to perform errands. She also made inquiries about placing Burley in a nursing home. She had made numerous similar inquiries before. Defendant returned home, fed Burley his lunch, and performed other errands, including inquiring further about placing Burley in a nursing home. At approximately 5:00 p.m., she checked on Burley and found him in a comatose state. She telephoned Aida Winters, her friend, for assistance and moments later, having ascertained that Burley was dead, summoned the police. Defendant was hysterical and continued in that state while the police and ambulance workers took away Burley’s body.
Initially, the Oakland County medical examiner, Dr. Bernardino Pacris, concluded that Burley died of natural causes. However, after he spoke with the police officers who were investigating the death, Dr. Pacris revisited his findings. He then concluded that the cause of death was £m insulin injection, although he found no needle mark. Burley did not have a prescription for insulin. It should be noted, however, that defendant was a diabetic. The process by which Dr. Pacris determined the cause of death was founded on an anatomical basis and the circumstances surrounding the death rather than on toxicological findings.
Defendant was charged with first-degree murdér. At trial, Dr. Pacris and Dr. Michael Evans[1] testified for the prosecution. Both Drs. Pacris and Evans concluded that *143 the evidence supported a theory that Burley died of an insulin overdose. In closing argument, the prosecutor argued that, given Burley’s numerous physical ailments, he was unable to prepare insulin for administration and inject himself with it. The prosecution also attempted to show that the circumstances surrounding the death gave rise to a suspicion of murder.
Defense counsel argued, on the other hand, that Burley either took his own life or died from natural causes. However, counsel did not present evidence to counter the prosecution’s medical experts, who concluded that Burley died of an insulin overdose. This was despite the fact that counsel had successfully petitioned for the appointment of an expert for the defense.
Ultimately, the court convicted defendant of second-degree murder. Relying on the prosecution’s medical testimony, the court found that Burley died of an insulin overdose. The court credited the prosecution’s argument and found it not believable that the gravely ill Burley was physically capable of injecting himself with a lethal dose of insulin.
Defendant appealed her conviction in the Court of Appeals. On its own motion, the Court appointed new counsel for her and remanded the case for a Ginther[2] hearing to determine whether defendant had received effective assistance of counsel at trial. Among the witnesses at the hearing were defendant’s former counsel and a forensic pathologist, Dr. Laurence Simson,[3] who was an expert witness brought in by defendant’s newly appointed appellate counsel.
*144 Defendant’s former counsel testified that he (1) never consulted an independent forensic pathologist, (2) never had the body tested for the presence of insulin, (3) spoke only briefly with his own general practitioner regarding the cause of death and was referred to an endocrinologist, Dr. Halsey, (4) spoke with Dr. Halsey but took no notes of the conversation, (5) did no research into Dr. Halsey’s expertise, (6) did not give either the general practitioner or the endocrinologist Burley’s medical records to review, and (7) did not speak to the physician who treated Burley during his last hospitalization.
The forensic pathologist, Dr. Simson, testified that there was a lack of significant evidence that Burley died of an insulin overdose. Instead, he concluded that Burley died of a multiple-drug overdose. He based his conclusion on the fact that Burley had a lethal level of morphine in his system along with therapeutic levels of several other drugs.
At the Ginther hearing, Dr. Pacris was questioned about his trial testimony that Burley died of an insulin overdose. He was asked if he had considered that a lethal dose of morphine was found in Burley’s body. He testified that he had based his conclusion that Burley did not die of a morphine overdose on his assumption that Burley had developed a tolerance to the drug. But he admitted that he had not checked to learn how much morphine Burley had been using.
At the conclusion of the hearing, Judge Chad C. Schmucker, who also presided at the bench trial, found that defense counsel had not provided ineffective assistance. He found that counsel’s brief consultations with Drs. Burgess and Halsey were all that was required of him. He also concluded that, even if counsel’s performance had been deficient, defendant could not show prejudice.
*145 In a split, unpublished decision, the Court of Appeals reversed defendant’s conviction.[4] The majority determined that, in light of the pivotal nature of the medical evidence, it was unreasonable for defense counsel to have consulted only briefly with the two doctors. It was unreasonable for him not to have furnished the physicians with documentation regarding Burley’s medical history or the circumstances surrounding his death. And because defense counsel’s deficient performance deprived defendant of a substantial defense, the majority held that there was a reasonable probability that it adversely affected the outcome of the trial.
The dissenting judge emphasized the prejudice prong of the test for ineffective assistance of counsel. He found no reason to conclude that the trial judge had clearly erred in concluding that defendant could not show prejudice.
The prosecution applied for leave to appeal in this Court. We heard oral argument on the application on October 3, 2007.[5]
THE SUFFICIENCY OF DEFENSE COUNSEL’S LEGAL REPRESENTATION
The standard for ineffective assistance of counsel is the same under both the Michigan and federal constitutions.[6] A defendant must show that defense counsel’s performance was objectively unreasonable and that this performance prejudiced the defense.[7] In this case, the *146 majority reinstates defendant’s conviction after deciding that defendant cannot show prejudice.
To demonstrate prejudice, one must establish “a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.”[8]
Here, the prosecution’s case hinged on the cause of death. The prosecution contended that defendant died of an insulin overdose, and it presented evidence to support this theory. The prosecutor argued that defendant was physically incapable of injecting himself with insulin. By failing to counter this theory, defense counsel left the finder of fact with two choices: It could find (1) that Burley killed himself by insulin overdose, a highly unlikely occurrence given his debilitated physical condition, or (2) that defendant killed Burley by administering a fatal dose of insulin. Thus, by failing to counter the prosecution’s theory of the cause of death, defense counsel left defendant with no viable defense.
By contrast, defense counsel could have challenged the prosecution’s theory of the cause of death, providing the trier of fact with a meaningful choice. Evidence could have been presented that Burley died from a different cause, such as a multiple-drug overdose, as Dr. Simson concluded. This would have been particularly effective in light of the fact that Dr. Pacris did not immediately identify the cause of death as an insulin overdose. Dr. Pacris considered the possibility of an insulin overdose only after the police informed him that they suspected Burley might have died from an insulin injection. Furthermore, Dr. Pacris did not check into Burley’s use of morphine, despite the fact that Burley *147 died with a large amount of morphine in his system. Importantly, unlike insulin, which is injected, morphine is available in pill form, and there was evidence that Burley had access to morphine pills.
Burley could have self-administered a fatal dose of morphine, either accidentally or intentionally.[9] Thus, had defense counsel challenged the cause of death, the finder of fact could have concluded that Burley died of a noncriminal act. Defendant’s appellate counsel demonstrated that trial counsel easily could have found an expert witness to refute the prosecution’s theory regarding the cause of death. It follows that the trial attorney’s failure to adequately investigate and pursue the viable theory that Burley died of a noncriminal act deprived defendant of a substantial defense.[10]
Because defendant has shown that her trial counsel’s performance deprived her of a substantial defense, she has met her burden of showing prejudice, unless other evidence rendered this defense unbelievable.[11] The *148 record reveals that, had defendant presented Dr. Simson’s testimony at trial, the evidence would have supported either of two competing theories of the cause of death. As the majority points out, there was circumstantial evidence that tended to show a guilty mind. The majority discusses only this evidence. But it ignores the evidence that tends to show that Burley died of a noncriminal act.
This evidence is that defendant and Burley had a relationship that had lasted nearly 30 years. During this period, Burley suffered from many illnesses, including an HIV infection. As Burley battled these ailments, defendant stood by his side, providing him with needed care. Defendant was not only Burley’s companion and caregiver during this period, she was his financial support. He had not been gainfully employed since the mid-1980s.[12] Hers is hardly the behavioral profile of a cold-blooded killer.
*149 The evidence also tended to show that Burley’s mental health had deteriorated and that he was possibly abusing morphine and other drugs. In fact, defendant had to call the police on the day Burley died because he was brandishing a knife, arousing her concern that he might hurt himself. And there was evidence that defendant had hidden drugs from Burley to prevent him from overdosing himself. Also, she had contacted numerous sources in the period before Burley’s death in an attempt to get him the 24-hour, 7-day-a-week care he required.
There are also innocent explanations for the acts to which the majority attributes sinister motives. Because defendant, not Burley’s family members, tended Burley toward the end of his life, it is not surprising that defendant was not eager to inform his family of his death. This is especially likely in light of the fact that, as defendant testified, she felt the family had turned its back on Burley.[13]
Nor does the fact that defendant was exasperated with providing Burley constant care render her a murderer. And defendant’s decision to call a friend before summoning the police after discovering Burley in a comatose state is understandable. Defendant could have been overwhelmed by shock and sadness at discovering her longtime companion near death. It is even more reasonable to attribute an innocent explanation to this behavior when one considers that defendant had prearranged for the friend to assist her if Burley died. Nor was defendant’s decision to cremate Burley unusual, since cremation is a common alternative to burial *150 in this country, especially for those who have suffered from debilitating ailments. Finally, the fact that defendant understood insulin’s effect on the body is not surprising in light of the fact that she is a diabetic.
The nonmedical evidence surrounding the death could support a finding that Burley died of a noncriminal act. Accordingly, had defense counsel challenged the cause of death, the finder of fact would have been left with two reasonable alternatives: (1) to decide that the evidence showed that defendant killed Burley or (2) to conclude that Burley killed himself, intentionally or accidentally, possibly to spare his loving companion of nearly 30 years the burden of his continuing care. The strategy employed by defense counsel left defendant with no viable defense, whereas another strategy could have resulted in an acquittal. Hence, confidence in the outcome has been undermined sufficiently to require a new trial. Accordingly, I would affirm the Court of Appeals decision.
The majority disagrees with me and reinstates defendant’s conviction. In so doing, the majority opinion seems to misapprehend defendant’s burden. It would seem to require defendant to prove that she is actually innocent of the crime in order to be entitled to relief. Even though defendant might be innocent, this is not the standard. The standard is “a probability sufficient to undermine confidence in the outcome.”[14] Because defense counsel’s performance deprived defendant of a viable, reasonable, and believable defense, the standard was met in this case.
CONCLUSION
The Court of Appeals decision to vacate defendant’s conviction did not hang on what some people term “a *151 legal technicality.” Instead, there is a very real possibility that defendant is innocent of the crime of which she has been convicted. Yet her counsel never gave the finder of fact a realistic option of returning a verdict of not guilty. By effectively conceding the cause of death, counsel deprived defendant of her only viable defense. The Court of Appeals correctly reversed defendant’s conviction and remanded the case for a new trial. I would affirm its judgment.
CAVANAGH, J., concurred with KELLY, J.

 Dr. Evans was a professor of toxicology and is the president and chief executive officer of AIT Laboratories.

 People v Ginther, 390 Mich 436; 212 NW2d 922 (1973).

 Dr. Simson is a forensic pathology consultant, a former professor of pathology, an Ingham County pathologist, and a national consultant in forensic pathology to the Surgeon General of the United States Air Force.

 People v Dendel, unpublished opinion per curiam, issued July 18, 2006 (Docket No. 247391).

 477 Mich 1012 (2007).

 People v Pickens, 446 Mich 298, 326; 521 NW2d 797 (1994).

 Strickland v Washington, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

 Id. at 694.

 At oral argument, I specifically inquired whether it is easier to self-administer morphine than it is to self-administer insulin. My concern was this: If it is unreasonable to conclude that defendant self-administered a fatal dose of insulin, why would it be reasonable to conclude that he self-administered a fatal dose of morphine? The answer that defendant’s counsel gave was that it is much easier to administer morphine because, unlike insulin, Burley’s “morphine was pills, and there was testimony that [Burley] had a large number of pills available to him and that he had access to those pills.” It is this difference that makes a self-administered overdose of morphine believable but a self-administered overdose of insulin by a man in Burley’s condition unbelievable.

 The majority criticizes me for explaining how trial counsel’s performance was deficient. It claims that this portion of my argument is “misplaced.” Ante at 126 n 10.1 disagree. In this case, the two prongs of the test for ineffective assistance of counsel are inextricably linked. I cannot explain how defendant was prejudiced without explaining how defense counsel’s performance was deficient.

 The majority claims that I apply the wrong standard by presuming prejudice. I do no such thing. In order to meet her burden of showing *148 prejudice, defendant had to show that defense counsel’s deficient performance undermined confidence in the outcome. Accordingly, if defendant shows that counsel’s performance deprived her of a viable defense, she has shown prejudice. This is because a viable defense equates to a reasonable chance at acquittal. Thus, I do not presume prejudice. Rather, I consider whether her counsel’s performance deprived defendant of a viable defense. If so, a new trial is required because there is a “reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 US at 694. On the other hand, if the defense defendant was deprived of was unbelievable, she would not be entitled to a new trial because she could not show prejudice.

 The majority suggests that I ignore evidence that defendant may have had an improper motive in caring for Burley. That is not true. I recognize that the circumstantial evidence pointed in different directions. I focus on the evidence that tended to show that Burley died of a noncriminal act because the majority fails to address this evidence at all. This is error because, when considering whether defendant was prejudiced, it is necessary to consider the totality of the circumstances surrounding Burley’s death.

 There was evidence that Burley’s family intentionally avoided him after he contracted an HIV infection. For example, he was no longer invited to family gatherings, such as Easter celebrations and Super Bowl parties.

 Strickland, 466 US at 694.